UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

ANGELA KAY FONTENOT            CIVIL ACTION NO. 6:16-cv-00772

VERSUS                              JUDGE WALTER

U.S. COMMISSIONER,              MAGISTRATE JUDGE HANNA
SOCIAL SECURITY
ADMINISTRATION

## REPORT  AND  RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be affirmed.

### ADMINISTRATIVE  PROCEEDINGS

The claimant, Angela Kay Fontenot, fully exhausted her administrative

remedies before filing this action in federal court.

On January 29, 2008, the claimant filed an application for disability insurance

benefits ("DIB"), alleging disability beginning on January 23, 2008.[1] Administrative

Law Judge Benita A. Lobo issued an adverse ruling finding the claimant not disabled

from January 29, 2008 (the alleged disability onset date) through October 1, 2009 (the

date of the ruling).  There is no evidence that the claimant requested reopening of the

---

[1]      Rec. Doc. 7-1 at 143.

original claim, and her counsel represented that the claim has not been reopened.[2]

Thus, the time period from January 29, 2008 to October 1, 2009 was previously adjudicated. When a claimant fails to timely appeal the denial of a disability claim, the claim becomes final and *res judicata* bars the claimant from seeking disability for that same period in a subsequently filed application.[3] Thus, *res judicata* bars any further consideration of the prior time period.

The claimant filed another application for DIB on October 23, 2009, which is the subject of this proceeding. She alleged disability beginning on October 2, 2009 (the day after the end of the period adjudicated in the prior ruling).[4] The application was denied.[5] A hearing was held on August 16, 2010 before ALJ Joan H. Deans,[6] and Judge Deans issued a decision on October 27, 2010,[7] concluding that the claimant was not disabled within the meaning of the Social Security Act from October 2, 2009 through the date of the decision. The claimant asked for review of the decision, and

---

[2]    Rec. Doc. 11 at 2, n. 8.

[3]    *Brown v. Astrue*, 344 Fed. App'x 16, 20 n. 3 (5th Cir. 2009); *Brown v. Apfel*, 192 F.3d 492, 495 (5th Cir. 1999); 20 C.F.R. § 404.957(c)(1).

[4]    Rec. Doc. 7-1 at 368.

[5]    Rec. Doc.7-1 at 151.

[6]    Rec. Doc. 7-1 at 43-77.

[7]    Rec. Doc. 7-1 at 156-163.

on January 27, 2012 the Appeals Council vacated Judge Deans's ruling and remanded the matter for further consideration.[8]

After Judge Deans's ruling was issued but before the Appeals Council vacated it, the claimant filed another application for DIB. The record contains an application summary dated November 6, 2009, indicating that the claimant talked with Social Security personnel about her new claim on October 28, 2009 and alleged a disability onset date of October 28, 2009 (the day after Judge Deans's ruling).[9] The record also contains several references to an application for benefits dated November 16, 2010.[10] A form dated February 7, 2011[11] denies a DIB claim made on November 16, 2010, and the Appeals Council's order vacating Judge Deans's ruling states that a subsequent claim for DIB filed on November 16, 2010 was rendered duplicative by the Appeals Council's decision to vacate and remand Judge Deans's ruling. But this Court was not able to locate an application with that date in the record. Nevertheless, this Court concludes that any application for DIB filed after October 23, 2009, whether actually filed on November 16, 2010, December 8, 2010, or any other date,

---

[8]      Rec. Doc. 7-1 at 176-179.

[9]      Rec. Doc. 7-1 at 379.

[10]     See, e.g., Rec. Doc. 7-1 at 167, 178, 493.

[11]     Rec. Doc. 7-1 at 167.

was merged into the application of October 23, 2009 when the Appeals Council vacated Judge Deans's ruling.

Following the remand of Judge Deans's ruling, a hearing was held on August 28, 2012 before ALJ Kim A. Fields.[12]  Judge Fields issued an adverse ruling on September 28, 2012,[13] finding that the claimant was not disabled from October 2, 2009 (the alleged disability onset date) through December 31, 2010 (the date the claimant was last insured).  In January 2014, the Appeals Council vacated Judge Fields's ruling and again remanded the matter for another hearing and ruling.[14]

A hearing was held before ALJ Monica J. Anderson on July 14, 2014,[15] and she issued an adverse ruling on November 24, 2014, finding that the claimant was not disabled from October 2, 2009 (the alleged disability onset date) through December 31, 2010 (the date last insured).  The claimant again asked the Appeals Council to review the decision, and on April 6, 2016, the Appeals Council concluded that there was no basis for review.[16]  Therefore, Judge Anderson's decision became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42

---

[12]     Rec. Doc. 7-1 at 78-92.

[13]     Rec. Doc. 7-1 at 184-193.

[14]     Rec. Doc. 7-1 at 200-202.

[15]     Rec. Doc. 7-1 at 93-139.

[16]     Rec. Doc. 7-1 at 7.

U.S.C. § 405(g). The claimant then filed this action seeking review of the Commissioner's decision.

SUMMARY OF PERTINENT FACTS

The claimant was born on June 28, 1968.[17] She was 46 years old at the time of the ALJ's decision and is now 49 years old. She quit school in the tenth grade but later obtained a high school equivalency diploma.[18] She worked as a resident care aid and trainer for mentally handicapped individuals, domestic baby sitter, and house cleaner.[19] She claims to have stopped working on September 1, 2005 due to injuries sustained in a motor vehicle accident.[20] Because of the adjudication of her prior disability claim, she now alleges a disability onset date of October 2, 2009[21] resulting from back problems, carpal tunnel syndrome, thyroid issues, depression, anxiety, headaches, diabetes, and high blood pressure.[22] She is also obese.[23]

---

[17]    Rec. Doc. 7-1 at 47, 81, 98.

[18]    Rec. Doc. 7-1 at 47, 82, 98-99.

[19]    Rec. Doc. 7-1 at 82, 99-101, 457, 475, 489.

[20]    Rec. Doc. 7-1 at 50-51, 82.

[21]    Rec. Doc. 7-1 at 368.

[22]    Rec. Doc. 7-1 at 168.

[23]    Rec. Doc. 7-1 at 25, 49, 81, 405, 506.

There is no medical evidence in the record related to treatment that the claimant received at the time of her motor vehicle accident and very little medical evidence related to the time period that was previously adjudicated. The record shows that the claimant has treated with family practice physician Dr. Thomas G. Fontenot since at least 2009, and the record contains his treatment notes from June 22, 2009 to May 27, 2014. During that time period, Dr. Fontenot treated the claimant for a variety of ailments including but not limited to hypothyroidism, Type II diabetes, hyperlipidemia, depressive disorder, ADHD (attention deficit hyperactivity disorder), restless leg syndrome, idiopathic peripheral autonomic neuropathy, benign essential hypertension, acute sinusitis, upper respiratory infection, bronchitis, hip pain, joint pain in the ankle and foot, displacement of cervical intervertebral disc without myelopathy, low back pain, backache, disorder of bursa of shoulder region, bicipital tenosynovitis, tenosynovitis of foot, fibromyositis, insomnia, malaise and fatigue, and injury of lower extremity.[24] Dr. Fontenot's records do not indicate that he has ever treated the claimant for carpal tunnel syndrome. On July 30, 2010,[25] the claimant saw Dr. Fontenot with regard to cellulitis, osteoarthritis in her knees, hypertension, generalized anxiety disorder, low back pain, tinea corporis (ringworm), ADHD, and

---

[24]     Rec. Doc. 7-1 at 878.

[25]     Rec. Doc. 7-1 at 557.

tension headaches. The treatment note also indicates that he was prescribing Meformin, which treats diabetes, and intended to obtain treatment records from Dr. Troy Vaughn and Dr. Steven Katz.

The claimant saw Dr. Troy M. Vaughn with the Alexandria Neurosurgical Clinic on September 8, 2008.[26] She had recently undergone a myelogram of the lumbar spine and EMG and nerve conduction studies of her arms. Dr. Vaughn stated that the EMG and nerve conduction studies showed median neuropathy electrically profound in both the left and right wrists. His impression was bilateral carpal tunnel syndrome, and he recommended surgery. He also stated that the myelogram showed disc degeneration and spondylosis at L5-S1. In his opinion, both the spondylosis and the claimant's obesity were contributing to her back pain and lower extremity radiculopathy. He stated that the claimant was severely overweight and would benefit from weight reduction. He did not find any indication for urgent surgical intervention with regard to her lumbar spine.

The claimant returned to Dr. Vaughn on September 30, 2008,[27] following carpal tunnel release surgery on her left wrist on September 16, 2008. She reported

---

[26]     Rec. Doc. 7-1 at 506-507.

[27]     Rec. Doc. 7-1 at 504-505.

significant improvement in pain and numbness in that hand as well as improved sensation in the first three digits of her left hand.

The claimant again saw Dr. Vaughn on November 17, 2008[28] following carpal tunnel release surgery on her right hand, which was performed on November 4, 2008. The incision from the surgery on her left wrist was completely healed. Dr. Vaughn detected a possible early superficial wound infection and prescribed antibiotics. The claimant was continuing to have mild weakness in her bilateral hand grip.

The claimant returned to Dr. Vaughn on December 5, 2008.[29] She reported continued improvement of the pain and numbness in both hands but also reported back and bilateral lower extremity pain. Dr. Vaughn recommended a home exercise program including walking, advised the claimant to continue pain management with Dr. Katz, and planned to reevaluate her condition in six months.

The claimant saw Dr. Steven Katz on June 11, 2009.[30] He noted that she had been diagnosed with intervertebral disc disease but was doing reasonably well. He stated that she had already had two epidural injections and would have a third. He continued her prescriptions of Vicodin Extra Strength and Soma. Dr. Katz performed

---

[28]     Rec. Doc. 7-1 at 502-503.

[29]     Rec. Doc. 7-1 at 500-501.

[30]     Rec. Doc. 7-1 at 570.

a lumbar epidural steroid injection on July 2, 2009.[31] On August 17, 2009,[32] he noted that the claimant had chronic back pain which would likely benefit from weight reduction and an exercise regimen. She was taking Percocet and Soma, which he continued. On September 1, 2009, Dr. Katz prescribed Lortab and Soma.[33]

In a function report dated November 14, 2009,[34] the claimant described how her impairments affect her functionality. She stated that she could stand up for only about twenty to thirty minutes at a time, could lift only ten to fifteen pounds, usually awoke with a headache, and usually lay down for a few hours in the afternoon. She prepared cereal for breakfast and a sandwich for lunch, and her husband and daughter assisted with meal preparation in the evening. She did some laundry and light housekeeping but could not mop or sweep due to back pain. She sometimes needed assistance getting out of the bathtub and tying her shoes. If she squatted or knelt, she needed help getting up. She did not drive much because of impaired coordination in her right leg. Although she had undergone carpal tunnel surgery, she continued to have numbness, swelling, and pain in her hands with decreased strength and a

---

[31]     Rec. Doc. 7-1 at 569.

[32]     Rec. Doc. 7-1 at 519.

[33]     Rec. Doc. 7-1 at 517-518.

[34]     Rec. Doc. 7-1 at 414-423.

tendency to drop things. Sometimes she had trouble opening medicine bottles. She had difficulty bending and sleeping. She experienced depression and anxiety attacks. She did not do any yard work. She shopped for groceries about once a week, usually with her daughter's assistance. She did not use a computer. She stated that her medication made her groggy and short tempered. She did not like to be around a lot of people.

On November 16, 2009, the claimant again saw Dr. Katz.[35] She was not doing well, having strained her back while cleaning house. He prescribed Anaprox, noting that she continued to have lower back pain and lumbar radiculopathy bilaterally, which he described as well controlled.

The claimant's sister-in-law, Alisha Fontenot, filled out a third-party function report on December 8, 2009.[36] She confirmed that the claimant did not sleep well at night due to pain, stayed home most of the time, and drove only when absolutely necessary. She stated that the claimant's daughter and husband did the bulk of the household chores and cooking. She stated that, when grocery shopping, the claimant selected the items, but her daughter or husband placed them in the buggy, loaded the car, and unloaded the car. She said that the claimant spent most of her time watching

---

[35]     Rec. Doc. 7-1 at 650.

[36]     Rec. Doc. 7-1 at 434-432.

television because she goes back and forth between sitting and lying down because of her back. She stated that the claimant reads less because of her carpal tunnel syndrome. She stated that the claimant did not go anywhere on a regular basis other than the grocery store. She confirmed that the claimant is very irritable. She stated that the claimant's medications affected her ability to complete tasks, concentrate, understand, and get along with others. She stated that the claimant could not walk long distances, became stressed out easily, and was not as friendly or social as she was before her accident.

On December 9, 2009, Dr. A. Edward Dean, who did not examine the claimant, evaluated the claimant's residual functional capacity.[37] He opined that she could occasionally lift ten pounds, stand or walk at least two hours per day, sit six hours per day, and perform unlimited pushing or pulling. In his opinion, she was capable of occasionally climbing stairs and ramps, balancing, stooping, kneeling, crouching, and crawling but should never climb ladders, ropes, or scaffolds. He found that she had no manipulative limitations. In his opinion, Dr. Fontenot's report of August 21, 2009, limiting the claimant to standing less than two hours per day, sitting less than six

---

[37]     Rec. Doc. 7-1 at 524-531.

hours per day, requiring alternate sitting and standing, and limiting pushing or pulling in the lower extremities was not supported by physical findings.[38]

On February 17, 2010, the claimant returned to Dr. Katz.[39] His treatment note reiterates a diagnosis of intervertebral disc disease and stated that the claimant was doing well on Lortab, Soma, and Anaprox. On May 17, 2010,[40] Dr. Katz again noted that the claimant was doing well, and he continued the same medications.

On July 30, 2010, the claimant's primary care physician, Dr. Fontenot, filled out a medical source statement of her ability to do work-related activities. In his opinion, her ability to lift and carry was limited to occasionally lifting and carrying ten pounds and frequently lifting and carrying less than ten pounds. In his opinion, she could stand or walk for less than two hours in an eight-hour workday, sit for less than six hours per day, and must periodically alternate sitting and standing to relieve pain and discomfort. He also opined that she was limited in her ability to push and pull in both her upper and lower extremities. He indicated that his conclusions were

---

[38]     This Court found no report from Dr. Fontenot in the record dated August 21, 2009, and no report of that date was referenced in the claimant's briefing. However, as will be discussed below, Dr. Fontenot evaluated the claimant's ability to perform work-related tasks on July 30, 2010 (Rec. Doc. 7-1 at 565-567), August 24, 2012 (Rec. Doc. 7-1 at 744-746), and July 11, 2014 (Rec. Doc. 7-1 at 890-892).

[39]     Rec. Doc. 7-1 at 572.

[40]     Rec. Doc. 7-1 at 598.

supported by the fact that an MRI had revealed a herniated disc at L5-S1.  He further indicated that the claimant has daily pain and numbness in the right lower extremity, occasional symptoms on the left, and can occasionally kneel but never climb, balance, crouch, or crawl.  He also stated that she develops extreme low back pain and right leg pain with sneezing and coughing, including neuropathy and muscle spasms.

The claimant returned to Dr. Vaughn on August 2, 2010,[41] reporting that she still had numbness in the tips of her fingers as well as pain in her right wrist.  She told him that her right wrist felt weak and she had trouble grasping objects.  She also complained of lumbar back pain that had worsened since her last visit and a burning sensation in her buttocks and legs.  Dr. Vaughn found that her strength was normal in her upper and lower extremities and that her reflexes were symmetric measuring +1 in all extremities.  His impressions were persistent numbness and pain in both hands not fully recovered following carpal tunnel surgery, disc degeneration and spondylosis at L5-S1, chronic lumbar back pain and lower extremity radiculopathy, and obesity.  His plan was to provide the claimant with new wrist splints to help with pain.  He also recommended diagnostic studies including EMG and nerve conduction studies, an MRI of the lumbar spine, and x-rays of the wrists, all of which the claimant refused.

---

[41]     Rec. Doc. 7-1 at 554-555.

On August 16, 2010, the claimant testified before Judge Deans.[42]  She stated that she could drive for about twenty minutes before it became uncomfortable, could sit for about thirty minutes to an hour without having to change positions, and could stand for twenty to thirty minutes without having to sit down.  She claimed to have residual numbness in her fingertips and swelling in her hands that prevented her from lifting much weight.  She confirmed that she had not had any further carpal tunnel syndrome testing.  She indicated that Dr. Vaughn told her that if the splints did not improve her hands, further surgery would be necessary.  She testified that writing, driving, sometimes eating, fixing her hair, and holding heavy objects was difficult due to her hands.  She stated that she had cut her fingers without feeling it.  She stated that she could not sweep and that her daughter and husband assist with cooking, cleaning, laundry, and shopping.

The claimant saw Dr. Katz again on August 30, 2010.[43]  Anaprox was causing stomach irritability; therefore, she was advised to take it only as needed.

On November 23, 2010, the claimant saw Dr. George Raymond Williams, an orthopedic surgeon.[44]  He noted that she was diagnosed with lumbar disc disease in

---

[42]     Rec. Doc. 7-1 at 43-77.

[43]     Rec. Doc. 7-1 at 592.

[44]     Rec. Doc. 7-1 at 606-609.

2005 and that pain in her lumbar region and lower extremities had increased over the past six months. She also complained of cervical pain with radiation into her arms. She had a history of carpal tunnel surgery with persistent numbness in both hands. She reported that her current medications did not offer significant relief. Dr. Williams observed an antalgic gait and noted that the claimant had difficulty with change of position and transfer onto and off of the examination table. Her arms and legs had normal muscle tone, no weakness, no atrophy, and no involuntary responses. Her deep tendon reflexes were all 2+ and symmetrical. Sensory testing was normal. She exhibited limited painful range of motion in her cervical spine with point tenderness over the mid to lower cervical spine. Both the Tinel's sign and the Phalen's sign were positive, indicating carpal tunnel syndrome. She had a limited range of motion in her lumbar spine with point tenderness over the lumbrosacral region as well as a positive straight leg raise test bilaterally. Her SI joints were mildly tender to palpation. Dr. Williams noted that the claimant's previous MRI was outdated, and he recommended an MRI of the cervical spine as well as an MRI of the lumbar spine. His diagnoses were cervical pain, cervical radiculopathy, lumbar back pain, and lumbar radiculopathy.

On December 7, 2010, the claimant returned to see Dr. Katz, who continued her medications.[45]

An MRI of the lumbar spine, obtained on December 13, 2010, showed a mild diffuse disc bulge at L5-S1 and mild bilateral subarticular stenosis at the same level. An MRI of the cervical spine, obtained on the same date, showed well maintained disc spaces, no impingement of the spinal cord, and no evidence of syrinx.

The claimant filled out another function report on December 14, 2010.[46] She stated that a ruptured disk caused pain that radiated down her right leg, making it difficult to sweep, mop, vacuum, sit still or stand for a long period, or lift heavy objects. She stated that she had trouble driving and walking due to decreased reflexes. She said that mornings were harder because she was stiff upon awakening and had a tension headache almost every morning. She stated that her impairments affected her sleep because she could not get comfortable in bed and sometimes stayed awake all night despite taking medication. She described trouble bending over, trouble getting in and out of the bath tub, and trouble reaching up to dry or style her hair. She complained of depression and being scared of getting hooked on pain medication. She stated that her husband did most of the cooking because she could

---

[45]     Rec. Doc. 7-1 at 731.

[46]     Rec. Doc. 7-1 at 447-454.

only stand for about thirty minutes at a time.  She stated that she drove only if really necessary due to trouble moving her right leg, which tended to go numb and feel heavy.  She stated that she shopped for groceries every other week for about thirty minutes with her husband or daughter.  She claimed to have difficulty writing because her hands hurt and her fingers get numb.

The remainder of the evidence in the record is for a time period after the date on which the claimant was last insured.  It is particularly notable that the claimant underwent an anterior lumbar interbody fusion surgery at L5-S1, performed by Dr. Williams on May 25, 2011.[47]  Before the surgery, she had physical therapy.[48]  After the surgery, she continued to treat with Dr. Katz for pain management,[49] and she continued to treat with Dr. Williams and Dr. Fontenot.  On July 12, 2011, Dr. Williams noted that the claimant was much improved.  She had only mild soft tissue pain with palpation at the lower lumbar spine region, no visible atrophy, no soft tissue triggers, no muscle spasms, and negative straight leg raise tests.  He restricted her from lifting more than ten pounds, and advised her to continue walking but avoid

---

[47]     Rec. Doc. 7-1 at 625-633, 671-677.

[48]     Rec. Doc. 7-1 at 575-576.

[49]     Rec. Doc. 7-1 at 720, 714, 705, 697, 782-783, 774-775, 778-779, 771-772, 886-887.

repetitive bending or twisting.[50]  On September 29, 2011,[51] straight leg raise tests were again negative, she had no muscle spasms, atrophy, or soft tissue triggers and Dr. Williams lessened the lifting restriction, advising the claimant to lifting no more than twenty pounds.[52]  When Dr. Williams saw the claimant on January 15, 2012,[53] he imposed no restrictions on her activities, again noting that straight leg raise tests were negative, and there were no atrophy, soft tissue triggers, or muscle spasms.  He noted that the claimant reported only intermittent low back pain, coincident with weather changes.  When the claimant returned to see Dr. Williams in July 2012,[54] she reported a deterioration in her condition including progressively increased lumbar pain.  Dr. Williams detected a limited range of motion of the lumbar spine, point tenderness over the lower lumbar spine and bilateral SI joints, diminished sensation on the right at L1-L5, and a positive right straight leg raise test.  He recommended an MRI of the lumbar spine.  An MRI of the lumbar spine, obtained on August 3, 2012,

---

[50]     Rec. Doc. 7-1 at 687-688.

[51]     Rec. Doc. 7-1 at 690-691.

[52]     Rec. Doc. 7-1 at 690-691.

[53]     Rec. Doc. 7-1 at 693-694.

[54]     Rec. Doc. 7-1 at 749-750.

was essentially normal.[55]  The claimant again saw Dr. Williams on August 21, 2012,[56] and he recommended that she continue conservative activities and continue with pain management.  He expressly did not recommend surgery.

On August 28, 2012, the claimant testified before Judge Fields.[57]  She stated that she drove only if she "really, really" had to because of her right leg.  She stated that she could stand for ten to fifteen minutes at a time, walk for fifteen to twenty minutes before having to sit down or lie down for a while, and sit for twenty minutes before having to change positions.  She said that she could not stay in one position for long.  She stated that she could lift five to fifteen pounds.  She stated that she shopped for groceries every week but required assistance because she could not lift things into the buggy.  She did laundry.  She claimed to have cut herself without feeling it and burned her hands with a curling iron.  Despite having had carpal tunnel surgery on both hands, she still claimed she had numbness and pain in the ends of fingers and throughout her hands.  She complained of difficulty grasping and holding objects.  She stated that she requires assistance with buttoning, zipping, and tying her shoes every other day or so.  She stated that she has the same symptoms she did

---

[55]     Rec. Doc. 7-1 at 736.

[56]     Rec. Doc. 7-1 at 751-752.

[57]     Rec. Doc. 7-1 at 78-92.

before her back surgery, including numbness, pain, and muscle spasms down both legs up her shoulders and in her neck. She stated that the past six months had been particularly rough. She also claim to be aggravated, depressed, and very short tempered with no patience whatsoever.

In October 2012, the claimant saw Dr. Fontenot for complaints of bilateral foot pain and intermittent swelling. He examined all of her joints and expressly found no tenderness, warmth, or objective synovitis and good range of motion in both wrists and all of her fingers. He found no acute symptoms with regard to her hands.

The claimant returned to Dr. Williams on December 12, 2012.[58] He noted that she has good and bad days but no atrophy, soft tissue triggers, or muscle spasms, and negative straight leg raise tests. He advised her to continue walking, to avoid bending and twisting, and to lift no more than twenty pounds.

An MRI of the lumbar spine was obtained on March 11, 2013[59] after the claimant reported a fall.[60] The MRI showed no significant impingement of the spinal cord and a minimal posterior disc bulge at T11-T12. The claimant returned to Dr.

---

[58]     Rec. Doc. 7-1 at 753-754.

[59]     Rec. Doc. 7-1 at 762-763.

[60]     Rec. Doc. 7-1 at 823.

Williams on March 19, 2013 for the results of the MRI.[61]  Straight leg raise tests were again negative, and there were no atrophy, triggers, or muscle spasms.  Dr. Williams made suggestions regarding her medication and expressly noted that no surgical intervention is indicated.

On March 26, 2013,[62] the claimant returned to Dr. Fontenot, with complaints of pain in her legs and left hip.  No problems with her hands or fingers were noted.

On April 3, 2013, EMG and nerve conduction studies were done on both legs, which showed no clear-cut electrophysiological evidence of radiculopathy.[63]

The claimant again saw Dr. Fontenot in May 2013.[64]  She complained of foot pain and swelling, headaches, and ADHD.  No problems with her arms, hands, or fingers were noted.  Dr. Fontenot's treatment note from July 30, 2013 again contained no reference to any problems with the claimant's arms, hands, or fingers.[65]  On August 26, 2013,[66] the claimant reported to Dr. Fontenot that she had joint pain and swelling in her extremities, particularly in the left great toe and left foot.  Nothing in

---

[61]      Rec. Doc. 7-1 at 759-760.

[62]      Rec. Doc. 7-1 at 823-827.

[63]      Rec. Doc. 7-1 at 765-769.

[64]      Rec. Doc. 7-1 at 828-833.

[65]      Rec. Doc. 7-1 at 835-839.

[66]      Rec. Doc. 7-1 at 840-845.

his treatment note indicates a specific problem with her arms, hands, or fingers. On September 6, 2013, Dr. Fontenot administered a cortisone injection in the claimant's left foot.[67] On November 16, 2013, the claimant complained to Dr. Fontenot about right shoulder pain, and a cortisone injection was administered to her right shoulder.[68] On December 23, 2013,[69] Dr. Fontenot treated the claimant with regard to acute sinusitis, an upper respiratory infection, and bronchitis. There is no mention of problems with her upper extremities. The claimant was treated for similar complaints on January 17, 2014, and Dr. Fontenot administered a second cortisone injection into her right shoulder.[70] The claimant returned to Dr. Fontenot on May 27, 2014[71] with chief complaints of insomnia, headache, ADHD, and needing medicine refills. She complained of diffuse lumbar tenderness and tenderness of the right shoulder. There is no mention of any problems with her hands.

---

[67]     Rec. Doc. 7-1 at 846-851.

[68]     Rec. Doc. 7-1 at 852-863.

[69]     Rec. Doc. 7-1 at 864-870.

[70]     Rec. Doc. 7-1 at 871-877.

[71]     Rec. Doc. 7-1 at 878-883.

MRI testing on June 3, 2014 showed mild discs bulges at L4-5, L3-4, and T11-12 but no significant impingement.[72] On June 16, 2014, Dr. Williams prescribed physical therapy.[73]

On July 14, 2014, the claimant testified at the final hearing.[74] She testified that her ability to drive was limited by pain and numbness in both legs, which she experienced both before and after lumbar surgery. She stated that she has muscle spasms in her legs and back as well as stiffness in her neck and headaches. She stated that she has problems with her hands "at times." Her fingers get numb, stiff, painful, and swollen. She cut herself without feeling it, and she has difficulty writing. She claimed to have trouble styling her hair and stirring when she cooks. However, she also testified that her carpal tunnel syndrome had improved. More specifically, she said "[t]he symptoms slacked, but yet I still have them at times." She further testified that, in 2009 and 2010, she was able to dress and bathe herself, wash dishes, cook, and do some laundry. She stated that she can sit for thirty minutes to an hour before standing up, could stand up for about an hour, and could walk for thirty to forty-five

---

[72] Rec. Doc. 7-1 at 800-801.

[73] Rec. Doc. 7-1 at 809.

[74] Rec. Doc. 7-1 at 93-139.

minutes. She stated that she could lift twenty to thirty pounds. She testified that she fell in December 2013 and injured her shoulder.

**ANALYSIS**

**A.** **STANDARD OF REVIEW**

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[75] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[76] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[77]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[78] In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence

---

[75]     *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[76]     *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[77]     *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[78]     42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

or substituting its judgment for that of the Commissioner.[79]   Conflicts in the evidence[80] and credibility assessments[81] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[82]

## B.   ENTITLEMENT TO BENEFITS

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[83]

A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last

---

[79]     *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[80]     *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[81]     *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[82]     *Wren v. Sullivan*, 925 F.2d at 126.

[83]     See 42 U.S.C. § 423(a).

for a continuous period of not less than twelve months."[84]  A claimant is disabled only

if his physical or mental impairment or impairments are so severe that he is unable

to not only do his previous work, but cannot, considering his age, education, and

work experience, participate in any other kind of substantial gainful work which

exists in significant numbers in the national economy, regardless of whether such

work exists in the area in which the claimant lives, whether a specific job vacancy

exists, or whether the claimant would be hired if he applied for work.[85]

## C.   EVALUATION PROCESS AND BURDEN OF PROOF

The Commissioner uses a sequential five-step inquiry to determine whether a

claimant is disabled.  This process requires the ALJ to determine whether the claimant

(1) is currently working; (2) has a severe impairment; (3) has an impairment listed in

or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is

able to do the kind of work he did in the past; and (5) can perform any other work.[86]

"A finding that a claimant is disabled or is not disabled at any point in the five-step

review is conclusive and terminates the analysis."[87]

---

[84]      42 U.S.C. § 1382c(a)(3)(A).

[85]      42 U.S.C. § 1382c(a)(3)(B).

[86]      20 C.F.R. § 404.1520.

[87]      *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120
(1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[88] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[89] The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[90]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[91] This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[92] If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to

---

[88]   20 C.F.R. § 404.1520(a)(4).

[89]   20 C.F.R. § 404.1545(a)(1).

[90]   20 C.F.R. § 404.1520(e).

[91]   *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[92]   *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

rebut this finding.[93]  If the Commissioner determines that the claimant is disabled or

not disabled at any step, the analysis ends.[94]

## D.    THE ALJ'S FINDINGS AND CONCLUSIONS

In this case, the ALJ determined, at step one, that the claimant did not engage

in substantial gainful activity between her alleged disability onset date of October 2,

2009 and her date last insured, December 31, 2010.[95]  This finding is supported by

substantial evidence in the record.

At step two, the ALJ found that the claimant has the following severe

impairments:  disorders of the back and obesity.[96]  This finding is supported by

substantial evidence in the record.  However, the claimant contends that the ALJ erred

in failing to find that her carpal tunnel syndrome is also severe.

At step three, the ALJ found that the claimant has no impairment or

combination of impairments that meets or medically equals the severity of a listed

impairment.[97]  The claimant does not challenge this finding.

---

[93]     *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[94]     *Greenspan v. Shalala*, 38 F.3d at 236.

[95]     Rec. Doc. 7-1 at 25.

[96]     Rec. Doc. 7-1 at 25.

[97]     Rec. Doc. 7-1 at 28.

The ALJ found that the claimant has the residual functional capacity to perform light work with certain exceptions listed in the ruling.[98]  The claimant challenges this finding.

At step four, the ALJ found that the claimant is not capable of performing her past relevant work as a resident care aid, domestic babysitter, and house cleaner.[99] The claimant does not challenge this finding.

At step five, the ALJ found that the claimant was not disabled from October 2, 2009 (the alleged disability onset date) through December 31, 2010 (the date last insured) because there are jobs in the national economy that she can perform.[100]  The claimant challenges this finding.

E.    THE ALLEGATIONS OF ERROR

The claimant contends that the ALJ erred (1) by failing to find that the claimant's bilateral carpal tunnel syndrome is severe; (2) by failing to properly evaluate the opinions of the claimant's physician Dr. Thomas Fontenot and the state agency review physician Dr. A. Edward Dean ; and (3) by failing to support her residual functional capacity evaluation with substantial evidence.

_____

[98]      Rec. Doc. 7-1 at 29.

[99]      Rec. Doc. 7-1 at 33.

[100]     Rec. Doc. 7-1 at 33-34.

## F.   THE SIGNIFICANCE OF THE MEDICAL EVIDENCE POST-DATING THE CLAIMANT'S DATE LAST INSURED

The record contains a great deal of medical and testimonial evidence from the beginning of 2011 until the fall of 2014.  But the claimant was not insured for Social Security disability benefits after December 31, 2010.  For a claimant to demonstrate that she is entitled to DIB, she must prove not only that she is disabled but that she became disabled prior to the expiration of her insured status.[101]  Thus, Mrs. Fontenot must establish that her disability began on or before December 31, 2010.

Medical evidence from a time period post-dating a claimant's date last insured may be relevant if it bears upon the severity of the claimant's condition before the expiration of her insured status or is relevant to the determination of whether onset occurred on the date alleged by the claimant.[102]  Retrospective medical opinions must clearly refer to the relevant period of disability and not simply express an opinion to the claimant's current status, and records describing a claimant's current condition cannot be used to support a retrospective diagnosis of disability absent evidence of an actual disability during the time of insured status.[103]  Therefore, retrospective

---

[101]     *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

[102]     *Loza v. Apfel*, 219 F.3d 378, 396 (5th Cir. 2000); *Ivy v. Sullivan*, 898 F.2d 1045, 1049 (5th Cir. 1990).

[103]     *McLendon v. Barnhart*, 184 Fed. App'x 430, 432 (5th Cir. 2006).

medical diagnoses may constitute relevant evidence concerning the onset date of disability but must be corroborated by evidence relating back to the claimed period of disability.[104]    Evidence of medical conditions—even per se disabling conditions—that became medically determinable after the date last insured must not be considered, and evidence establishing the degeneration of a condition after the expiration of a claimant's insured status is not relevant to the Commissioner's disability analysis.[105]  Therefore, this Court did not consider Dr. Fontenot's medical source statements of August 2012 and July 2014[106] and carefully scrutinized the evidence from after the date on which the claimant was last insured.

**G.**    **DID THE ALJ PROPERLY EVALUATE THE SEVERITY OF THE CLAIMANT'S CARPAL TUNNEL SYNDROME?**

The claimant contends that the ALJ erred in failing to find her carpal tunnel syndrome severe.  An impairment is not severe only when it is a "slight abnormality" having "such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education[,] or work

---

[104]    *Luckey v. Astrue*, 458 Fed. App'x. 322, 326-27 (5th Cir. 2011); *Likes v. Callahan*, 112 F.3d 189, 191 (5th Cir. 1997).

[105]    *Dominguez v. Astrue*, 286 Fed. App'x 182, 185 (5th Cir. 2008); *Torres v. Shalala*, 48 F.3d 887, 894 n. 12 (5th Cir. 1995).

[106]    Rec. Doc. 7-1 at 744-746, 890-892.

experience."[107]  Following a careful reading of the ALJ's decision, this Court finds that the ALJ applied the proper legal standard in reaching her conclusion regarding the severity of the claimant's carpal tunnel syndrome.  The claimant had carpal tunnel surgery on both hands in 2008.  Thereafter, she allegedly continued to have symptoms including pain, swelling, and numbness in her hands and fingers.  When she saw Dr. Vaughn in August 2010, he found, despite her subjective complaints, that her strength was normal in her upper and lower extremities and that her reflexes were symmetric measuring +1 in all extremities.  His impression was that her hands were not fully recovered from the carpal tunnel surgery, and he recommended that she have further testing done, but she refused.  Dr. Vaughn prescribed splints for her to wear on her wrists.  When the claimant saw Dr. Williams in November 2010, she had objective signs of carpal tunnel syndrome.  But there is no indication in the record that she ever had any further treatment of that condition.  There is no evidence in the record that the claimant ever returned to see Dr. Vaughn again, and there is no evidence in the record that Dr. Williams or Dr. Fontenot ever treated the claimant for carpal tunnel syndrome.  Furthermore, the claimant testified at the most recent hearing that her carpal tunnel syndrome symptoms improved over time, and she only experienced functional limitations due to carpal tunnel syndrome "at times."

---

[107]     *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985).

Although the standard for determining whether an impairment is severe is different from the standard for determining whether an impairment is disabling, it is notable that when a claimant fails to follow the treatment prescribed by her physician, she will not be found disabled so long as the record does not excuse the lack of treatment or otherwise support disability.[108]  In other words, a "treatable condition which a claimant declines or refuses to treat is not disabling."[109]  In his case, the record evidence supports the ALJ's conclusion that the claimant's carpal tunnel syndrome was not severe because the claimant failed to seek further diagnostic testing or treatment of that condition.  This Court finds that there is substantial evidence in the record supporting the ALJ's finding that the claimant's carpal tunnel syndrome is not severe.  Therefore, this assignment of error lacks merit.

## H.    DID THE ALJ PROPERLY EVALUATE THE OPINIONS OF DR. FONTENOT AND DR. DEAN?

The claimant contends that the ALJ erred in evaluating the medical opinions of Dr. Fontenot and Dr. Dean.  Dr. Dean is a state agency review physician, while Dr. Fontenot is the claimant's treating family practice doctor.  Dr. Dean determined that the claimant had the residual functional capacity to perform light work, while in Dr.

---

[108]        20 C.F.R. § 404.1530; *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990).

[109]        *Mosby v. Apfel*, No. 99-1031, 2000 WL 174897, at *4 (E.D. La. Feb. 14, 2000).

Fontenot's opinion, the claimant is much more limited in her capabilities. Dr. Fontenot opined that the claimant can lift no more than ten pounds, can walk or stand less than two hours in a work day, and can sit less than six hours in a work day. He also opined that she would need to periodically alternate sitting and standing to relieve pain or discomfort.

The ALJ found the claimant capable of performing light work. The Social Security regulations define light work as requiring the ability to lift no more than twenty pounds at a time.[110] Social Security Ruling 83-10 explains that the full range of light work requires standing or walking, off and on, for a total of approximately six hours out of an eight-hour work day.[111] In reaching the conclusion that the claimant can perform light work, the ALJ gave no weight to Dr. Fontenot's opinions and gave great weight to Dr. Dean's opinions.

Ordinarily, a treating physician's opinions on the nature and severity of a patient's impairment are given more weight than opinions of non-examining doctors but a treating physician's opinions must be well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other

---

[110]        20 C.F.R. § 404.1567(b).

[111]        "The Social Security Administration's rulings are not binding on this court, but they may be consulted when the statute at issue provides little guidance. The Fifth Circuit has frequently relied upon the rulings in evaluating ALJs' decisions." *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001) (internal citations omitted).

substantial evidence."[112]   The ALJ may reject any physician's opinion when the evidence supports a contrary conclusion.[113]   However, an ALJ cannot reject a medical opinion without an explanation supported by good cause.[114]   There is good cause for rejecting a medical opinion when the treating physician's evidence is conclusory; unsupported by medically acceptable clinical, laboratory, or diagnostic techniques; or otherwise unsupported by the evidence.[115]

In rejecting Dr. Fontenot's opinions, the ALJ noted that he failed to provide any objective medical evidence to back up his findings.   The only clinical support given by Dr. Fontenot to support his opinions was that an MRI had shown the claimant to have a herniated disc at L5-S1.   However, there is no MRI report in the record predating Dr. Fontenot's statement of July 30, 2010.   Therefore, there is no way of correlating the MRI report with Dr. Fontenot's statement.   Furthermore, an MRI of the claimant's lumbar spine, obtained on December 13, 2010, showed a mild diffuse disc bulge at L5-S1 and mild bilateral subarticular stenosis at the same level. An MRI of the cervical spine, obtained on the same date, showed well maintained

---

[112]      *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995)

[113]      *Martinez v. Chater*, 64 F.3d at 175-76.

[114]      See *Loza v. Apfel*, 219 F.3d at 395 (citations omitted).

[115]      *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000).

disc spaces, no impingement of the spinal cord, and no evidence of syrinx.  As the ALJ noted, these objective findings are inconsistent with Dr. Fontenot's opinions concerning the claimant's capabilities.  Accordingly, this Court finds that the ALJ sufficiently explained her reasoning for failing to give any weight to Dr. Fontenot's opinions and for relying, instead, on Dr. Dean's opinions and further finds that this assignment of error lacks merit.

I.    **IS THE ALJ'S RESIDUAL FUNCTIONAL CAPACITY FINDING SUPPORTED BY SUBSTANTIAL EVIDENCE?**

The claimant contends that the ALJ erred in evaluating her residual functional capacity by failing to consider the severity of her carpal tunnel syndrome, by failing to properly weigh the physicians' opinions, and by failing to properly evaluate the lay witness testimony of her sister-in-law, Alisha Fontenot.  Having found that the ALJ's analysis of the severity of the claimant's carpal tunnel syndrome was not flawed, and having found that the ALJ had a valid basis for weighing the doctors' opinions, those issues will not be addressed further.

Although the ALJ did not expressly review Alisha Fontenot's functionality report, the ALJ did indicate that she reviewed all of the evidence in the record before making her residual functional capacity ruling.  Alisha Fontenot's evidence is subjective in nature and, while it was consistent with the claimant's functional ability

reports and hearing testimony, it did not provide any particular insight into the claimant's conditions or impairments different from that to be gleaned from the claimant or the medical sources. This Court finds that the claimant was not prejudiced by the ALJ's failure to expressly address Alisha Fontenot's functionality report.

Finally, the claimant argued that the ALJ erred in evaluating her residual functional capacity by failing to properly consider her ability to stoop. While Dr. Dean opined that the claimant could stoop only occasionally, the claimant failed to show how this prevents her from performing light work. Neither the statutory definition of light work nor the Social Security rule on determining a person's capability to do other work indicates how much postural movement (or stooping in particular) is necessary for light work, and the claimant failed to direct this Court to any other authority for evaluating how an ability to stoop only occasionally should be factored into the residual functional capacity assessment. Therefore, this assignment of error lacks merit.

## CONCLUSION AND RECOMMENDATIONS

**IT IS THE RECOMMENDATION** of this Court that the decision of the Commissioner be **AFFIRMED** and this matter be dismissed with prejudice.

-37-

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[116]

Signed in Lafayette, Louisiana, this 14th day of August 2017.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[116] See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

-38-